ROGERS v. LOUISVILLE & N. R. CO.

(Circuit Court, W. D. Tennessee. May 28, 1898.)

No. 130.

**MASTER AND SERVANT—DEFECTIVE CAR—EVIDENCE—DIRECTING VERDICT.**
    The mere fact that a brakeman was killed by falling at night from a freight train, composed of 12 or 14 cars, and being run over, is not sufficient to warrant an inference that he slipped from the roof of a certain car, which was defective in having no footboard; and, in the absence of all other evidence, the court will direct a verdict for defendant.

Action by Susan Rogers, administratrix, against the Louisville & Nashville Railroad Company, for the death of her son. The court directs verdict for defendant.

Thomason & Thomason, for plaintiff.
Sweeney & Farobough, for defendant.

HAMMOND, J. (charging jury). Because the plaintiff has failed to show, by a preponderance of the proof in this case, that her son lost his life by the negligence alleged in the declaration, I am constrained to direct that your verdict should be for the defendant, and it will be entered accordingly.

Technically, this is all I need say to you, and we might end the case with that direction; but it is my great desire, and constantly my habit, whenever I take that course with a case, to justify, as far as I am able to do so, the action of the court, by giving to the gentlemen of the jury the reasons that actuate me in giving that direction, so that it may find approval in your own intelligence, if it can find approval at all.

The great trouble about all these cases is the human sympathy that demands and overwhelmingly suggests to everybody that where a man loses his life through such a calamity as came upon this plaintiff's son, and he was in the service of a railroad company, we should like to see her compensated for the loss in some way, by having a sum of money that will help take care of her, in the absence of the son upon whom she depended. But it would be utterly impossible to introduce into our law the practice that would make a railroad company an accident or a life insurance company, to pay all of its employés who are hurt and injured in its service a sum of money to compensate those who are dependent upon them. There is no such law as that, and it is the greatest injustice to the railroad companies to proceed upon the theory of compelling them to pay money to everybody who is injured in their service. They do not get any pay, like accident insurance companies. You had a trial of an instance of that before you,—that, where there is a life insurance policy or an accident insurance policy, the company gets its regular premiums, which are adjusted according to the circumstances of the case, and according to the risk, which premiums are supposed to compensate that company for its promise to pay damages when an accident occurs or when his life terminates. The railroad companies do not receive any such premiums as that. They pay high wages, and good wages, for the services that men do for them, and they pay them, and must pay them, upon the theory that the man's wages compensates him for the risk that he takes; and every man who enters into the service of a railroad company agrees, when he goes into it,—as a matter of bargain and as a matter of contract, he agrees with the railroad company,— that he will take the ordinary risks that belong to the service into which he enters. There is not in the history of human affairs any more dangerous employment, scarcely, than that of a railroad brakeman. Perhaps there are some more hazardous employments, in the handling of dynamite, gun cotton, powder, and explosives of that kind, but, outside of that class of business, men do not engage in any business so hazardous, and with so many risks attendant to it, as that of a railroad brakeman, and all that risk he takes when he goes into the service of the company; and statistics show that a very, very large per cent. of the men who go into it are sooner or later in some way injured or lose their lives.

Now, the railroad company, on its part, enters into a bargain that it will furnish to the men who work for it reasonably safe appliances, that are known to the business, for the purpose of their protection against the dangers that are involved in the service; and the law rigidly requires that every railroad company shall perform that obligation of its contract, and that it shall have its appliances for doing the work in a reasonably safe and proper condition; if the safety depends upon the structures and appliances, that the railroad shall have that which is reasonably safe. They are not required to have the best. You can sit down and calculate that, by the high art of mechanics, one structure would be safer than another. We are a great deal safer if we take an ocean greyhound to go across the Atlantic ocean than we would be were we to take a common, everyday tramp ship, but if we take the tramp ship we take the risks that attend the tramp ship. The company that runs the tramp steamer is not bound to furnish us all the safety that we find upon the ocean greyhound. And so it is with these railroads. They are not bound to furnish the best appliances that are known to the art of railroading to their employés. They have the right to furnish such as they are able to pay for, such as their business demands, and such as are in common use among railroad corporations in doing the transportation of the country, and that appliance which is ordinarily in use by them and considered safe is that which they have the right to supply; and, when a man goes into their service, he knows what kind of railroad company it is, what kind of appliances they have, and he knows what their ordinary method of doing business is, and he takes the risks that are incident to that service.

Now, we know, and it is in this record, that in making up these freight trains, for passing over the railroad, in what we call the "freight transportation department," the company may use cars that are furnished with air brakes, and when they use those cars, and have a train made up of cars that are using the ordinary air brake, the brakemen probably do not have to walk over the cars, and that danger is eliminated from that kind of a train, and it is a great deal safer than one where the brakeman has to walk about and over the train, and turn the crank or the wheel that sets the brakes on the freight cars. But we also know, as a matter of history,—the history of our country,—that the railroad companies do not all of them have their cars furnished with air brakes. They may not all be able to pay for them; at least, they all have not got them. We have a law, of course, that requires them now to use that kind of brake, and the interstate commerce commission has given them two years longer in which to equip their service with that kind of less dangerous and more useful brake, and also to put in a less dangerous coupling; but until that law takes effect, and the dangers incident to the service are lessened by obedience to the law of having the air brakes, and having the patent couplers, the brakemen, when they are in the service, take the risk of such appliances as they have.

And we know that, in the common everyday transportation of railroads and interchange of traffic with each other, they congregate to-

gether, in a train, cars that are not uniform in their construction, and they are not uniform in the appliances that they have for the protection and safety of the brakemen. Whatever danger there is in this want of uniformity the brakeman takes. He knows, when he goes into the service of the Louisville & Nashville Railroad Company, or any other railroad company in this country, no matter where it is located, that it is utterly impossible to provide a perfectly uniform train, with reference to its appliances and to the heights of the cars, and those things that would go to minimize and lessen the dangers, and therefore, when he goes into the service, he takes the risks of any inequalities that there may be about the train.

But, taking all that into consideration, there is nothing better settled in our law—because it is settled by a decision of the supreme court of the United States—than that, whenever a railroad company receives from another company a railroad car to be transported on its own line, it owes a duty to its railroad hands that they shall see that that car is reasonably safe for the service into which they are to put it. They are bound to inspect it, not only for the purpose of seeing to it that the wheels are all right and whether the brakes are all right, but they are bound to inspect it all over and everywhere, and see whether it is properly constructed, and properly adapted to the uses to which they are about to put it, and if they do not make that kind of an inspection they are guilty of negligence. If they do make that kind of an inspection, and they accept and put into the service a deficient and defective car, which is not reasonably safe, they are negligent; and I would submit it to you, as a question for your determination in this case, whether or not it was not an act of negligence on the part of the Louisville & Nashville Railroad Company to put in its train on this occasion a car which had a roof that was oval or cylindrical in its construction, and from 14 to 30 inches higher than the ordinary cars that they used in their freight trains, and without that car with the oval roof having on it the ordinary footrun for the safety of the brakeman, which we find on the ordinary freight cars. They might have put a temporary footrun upon it, or they might have rejected it and declined it entirely; but I have not any doubt, if you found from the facts in this case, that this car was that kind of a car, and it had no footrun upon it, and they took it in that way, it would be an act of negligence, and I would so say to you, if I had any occasion to submit that question to you.

But the difficulty which the plaintiff has in this case is this: That the law requires every plaintiff to show, as I told you before,—not beyond a reasonable doubt, but by a preponderance of the testimony, —that the injury occurred through the particular negligence which is alleged against the railroad company. It is not sufficient to show that the railroad company was negligent, and the plaintiff has not entitled herself to a verdict when she shows that this railroad company was negligent in taking this car into its freight train without a footboard for the brakeman to walk over. She must go further than that, and show that it was by that specific act of negligence that the man was killed.

88 F.—30

Now, what proof is there in this record that that was so? It is not necessary, and certainly it would be unreasonable, to demand that when these trains are worked in the night, and when the accident occurs, as this did, about daylight in the morning, the plaintiff should be required to bring forward here some eyewitness that saw him fall off the top of that car that did not have the footboard on it. No such unreasonable demand as that could be made upon the plaintiff. But it is her duty to show, by whatever proof is at hand,—if she has not got eyewitnesses, there must be circumstances or conditions that exist in the case from which you can see that it is a fair and reasonable inference upon a preponderance of the testimony,—that her son's life was lost by reason of that particular defect that was in the train.

If that kind of condition and that kind of circumstance are not found in the physical facts and in the proof, it is the plaintiff's misfortune. The law presumes everything in favor of the defendant until the plaintiff has proved the case by the preponderance of the testimony. You cannot charge negligence against a defendant upon mere inferences that are unfounded from the facts and circumstances of the case. Negligence must be proved in every case by either the positive testimony of witnesses who saw and can testify as to the facts in dispute, or by facts and circumstances—what we ordinarily call "circumstantial evidence"—that are reasonably conclusive of that fact.

This young man fell off the train not far from Bells, beyond all question, and was killed, but the proof here is that there were 12 or 14 cars in the train. We know, as well as we can know anything, that it is an easy thing for a man to have fallen off of any one of those 14 cars. He might have fallen between any one of the 14 cars that were on the train. He certainly might have fallen between any one of them that were in and about the middle part of the train, where it was his business to work. This car was in the rear part of the train,—the second car in front of the caboose,—and it is true that he had to pass over this unprotected roof in order to get to his place of working; but it does not follow, because he had to pass over it, that his foot slipped for want of a footboard on that car. It might have slipped after he had walked entirely across the train. It might have slipped as he went from one of those cars to the other. He might have gone entirely across that train, to a place on the other end, and been turning a brake in some other place, and have fallen off. It is not at all a reasonable inference to say, from the simple fact that there was a defective car in this train, that this man lost his life because of that defect, without any other fact to point to it as the place where he did slip off.

I have been very carefully listening to Col. Thomason's argument, and have been looking and searching through all the facts of this case to see if there was a single circumstance to lead to the fact that this man slipped off of this particular car any more than any other car, or that he might have fallen between this car any more than he might have fallen between any other car,—but it was apparent that he fell in between some car, as the wheels crushed him, but

it is impossible to identify the particular car that did run over him, because his coat sleeves protected or kept the wheels from being spattered up with the blood,—but I have been unable to find a single fact or a single circumstance that would point, reasonably or unreasonably, to an inference that this man fell off of this defective car, or fell between this defective car and the one next to it (for that was the way he was hurt unquestionably), any more than that he fell between any other two cars in that train; and, in the absence of such a fact or of such a circumstance, it is a pure assumption to say that he was hurt by falling in between the defective car and the one next to it. The fact that it was defective does not prove that fact. It might have been that he lost his footing in some other way, and there are so many other ways in which he might have done it that it is not reasonable to say that he lost it by that particular car simply because that particular car happened to be on this train; and for that reason I do not submit this question of the negligence of the company to your judgment, and do not submit the question of his falling off the train to you, because the plaintiff has wholly failed, in my judgment, to show by a preponderance of the testimony that her son's life was lost by reason of the defect which had been proved against this railroad company on this train, if you should come to the conclusion that it was such a defect as that.

The only matter that has troubled my judgment about it has been whether or not I should leave it to the jury to say, from the existence of the defect itself, that it was the cause of the accident; but I have come to the conclusion that, in the absence of any other fact or any other circumstance to show that it was lost by the defective car, it is my duty, instead of submitting it to you, to say to you there is no proof in this record that the plaintiff lost his life by the alleged negligence in the declaration, and for that reason I have directed your verdict, and let it be so recorded.